UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

STEVEN HARKOLA,

                        Plaintiff,          **No. 09-CV-6318(MAT)**
                                            **DECISION and ORDER**

            v.

ENERGY EAST, UTILITY SHARED SERVICES,

                        Defendant.
_____

## I.    INTRODUCTION

Plaintiff, Steven Harkola ("Harkola" or "Plaintiff"), represented by counsel, brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-18, and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290 et seq. Plaintiff alleges that his former employer, denominated in caption as "Energy East Utility Shared Services", terminated his employment based on his gender. Plaintiff alternatively contends that he was terminated in retaliation for engaging in a protected activity, namely, participating in investigations conducted by his employers's human resources department ("Human Resources").

Presently pending before the Court is the employer's motion for summary judgment (Dkt #12) pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Rule 56"). For the reasons set forth below, the Court finds that Plaintiff has failed to establish a

<u>prima</u> <u>facie</u> case both with respect to his discrimination and retaliation claims.

Accordingly, the Court grants the Motion for Summary Judgment (Dkt #12) in its entirety and  dismisses Plaintiff's Complaint (Dkt #1) with prejudice.

## II. Factual Background and Procedural History

### A. The Corporate Structure of Plaintiff's Employer

Until it was acquired in September 2008 by Iberdrola, a Spanish power company, Energy East Corporation ("Energy East") was a regional utility holding company operating in several states in the northeastern United States. Energy East owned six regulated utility companies but did not have its own employees at any time.

Utility Shared Services Corporation ("USSC") was incorporated in 2003 to provide information technology, human resources, purchasing, financing, and accounting services for the six utilities held by Energy East. At all times, Defendants state, USSC was a separate corporation and maintained a corporate identity separate from Energy East. Sheri Lamoureux Affidavit ("Lamoureux Aff."), ¶¶2-4.

### B. Plaintiff's Employment

Plaintiff was employed by USSC as a Director of Support Services from 2003 until his termination in October, 2008. As the Director of Support Services, Harkola was responsible for managing staff, implementing new technologies, and implementing the processes necessary to support those technologies. Four managers

reported to Harkola, including at different times Joanne Malyszek ("Malyszek") and Richard Altamiri ("Altamiri").

### C.   USSC's Anti-Discrimination Policies

USSC has an Equal Employment Opportunity Policy, a Sexual Harassment-Free Work Environment Policy, and a Harassment and Discrimination-Free Work Environment Policy (collectively, "the EEO Policies"). Copies of these policies are provided to employees at the time they are hired, are available at all times to all employees on the company intranet, and are also incorporated into the Company's Code of Conduct, available in hard copy and on the intranet. Lamoureux Aff., ¶5-6; Exhibit "A." The EEO Policies prohibit discrimination, harassment, and retaliation for engaging in a protected activity, and encourage employees to promptly report any behavior, speech or other activity that may violate a policy. They also inform employees that complaints are kept as confidential as possible. Lamoureux Aff., ¶5; Exhibit "A."

In addition to the general anti-discrimination and anti-harassment training provided by a program titled, "Matter of Respect", all managers receive training specifically tailored to the managers' specific duties, including hiring, discipline, and termination. Managers are advised to promptly report any complaints of harassment, discrimination or retaliation to Human Resources. Lamoureux Aff., ¶6; Deposition of Steven Harkola ("Harkola Dep.") at 71. Harkola received training on the Company's EEO Policies in December of 2003, and attended "Matter of Respect" Training which

also covers the EEO Policies on July 24, 2007. Lamoureux Aff.,
Exhibits B & C.

### D.    The 2006 Complaint of Sexual Harassment Against Plaintiff

In 2006, an employee in Harkola's group, Michael Brockmann
("Brockmann"), complained to his manager, Malyszek, regarding
sexually offensive comments allegedly made by Harkola. Malyszek
followed Defendant's policy and reported the matter to Human
Resources. In accordance with the EEO Policies, Human Resources
conducted an investigation into the complaint. Guy Aff., Ex. "D" at
81-82; Deposition of Annette Kendrick ("Kendrick Dep.") at 55.
Apart from reporting the matter and cooperating in answering
questions posed to her, Malyszek was not involved in the
investigation and was not told of the outcome. Deposition of Joanne
Malyszek ("Malyszek Dep.") at 82.

Kendrick, the Human Resources manager, met with Harkola
concerning Brockmann's complaint. She also interviewed Brockmann,
Malyszek, and a third employee in Brockmann's work group, Jackie
Stewart ("Stewart"). Kendrick Dep. at 55-58; Harkola Dep. at 77.
Malyszek, Brockmann, and Stewart each described to Kendrick three
identical incidents involving Harkola. Kendrick Dep at 56-57. In
the first, Harkola referred to a red gym bag either he or
Brockmann was carrying as a "pussy bag." Harkola Dep. at 66.
Harkola admitted that he had made that comment. Harkola Dep. at 66;
Kendrick Dep. at 57.

The second incident involved Harkola, at a meeting, referring to a box on a checklist as the "G-spot." Harkola Dep. at 67. At his meeting with Kendrick, Harkola admitted the incident occurred and that he had joked about it. Id. at 57. At his deposition, however, Harkola claimed that he said the word only one time by accident and did not, as the three other witnesses reported to Human Resources, repeat the word. Id. at 67.

The third claim was that Harkola made a comment to the effect that women attending a conference with him should wear low-cut blouses. Harkola denied that he made this statement and contended the employees made it up. Harkola Dep. at 67-68; Kendrick Dep. at 57-58.

At the conclusion of the investigation, Human Resources recommended to Harkola's supervisor, Patrick Neville ("Neville") that Harkola be disciplined for inappropriate workplace language and be given a two-week suspension. Kendrick Dep. at 58. Neville approved the recommendation and Harkola was suspended for two weeks. Kendrick Id.  Harkola was permitted to apologize to the three employees for having made them uncomfortable.

Throughout the investigation and at its conclusion, Harkola was advised to keep the matter confidential, in accordance with company policy. After he returned from suspension, however, Harkola confronted Malyszek and asked her why she had made the complaint to Human Resources. Harkola Dep. at 72; 74-75. Malyszek told him that she simply was following company policy in doing so.  Id. at 72.

-5-

**E.    The Performance Review Involving Brockmannn**

Employees at USSC are evaluated by their managers at the mid-year point and again at the end of the year. The managers prepare the evaluations which are then approved by the Directors and Vice-Presidents before being sent to Human Resources. Lamoureux Aff., ¶9. During the end of year reviews, employees are rated based upon their performance in the objectives and competencies laid out in the beginning of that year. As a result of the numerical ratings received in these areas, employees fall into three overall performance categories—exceeded expectations ("High Performer"), met expectations ("Acceptable Performer"), or did not meet expectations ("Low Performer"). Id., ¶10.

Employees who receive a Low Performer rating are placed on a performance improvement plan ("PIP") and given the opportunity to improve their performance. If an employee successfully meets his PIP's objectives within ninety (90) days, he is not terminated for low performance. If he fails to meet those objectives, he is terminated. Lamoureux Aff., ¶ 11. An employee rated as a Low Performer may appeal to Human Resources, which subsequently reviews the rating and determines if it is warranted based on the documentation in the employee's file. Id., ¶12.

Vice-presidents at USSC are required to have five (5) percent of their employees fall into the Low Performer rating each year. This sometimes can result in the Directors or Vice-Presidents reclassifying an employee with marginal evaluations into the Low

Performer category in order to meet their "quota" of Low Performers. Lamoureux Aff., ¶13. For instance, Harkola testified that in some cases, Neville would direct him to place an individual in the Low Performer category which would result in that employee receiving a PIP. Harkola Dep. at 32. In some cases, Harkola agreed with Neville's decision; sometimes, he did not. Id. at 34.

In 2008, Brockmannn's manager, Malyszek, jointly decided with Harkola to rate Brockmannn as a Low Performer and place him on a PIP. Malyszek Dep. at 86; Harkola Dep. at 100; Kendrick Dep. at 28. Neville also reviewed and approved the decision to place Brockmannn in the Low Performer category. Deposition of Patrick Neville ("Neville Dep.") at 17.

Dissatisfied, Brockmannn appealed his Low Performer rating. Neville Dep. at 18; Malyszek Dep. at 86; Harkola Dep. at 101. Malyszek discussed the appeal with Kendrick, who defended Malyszek's decision, and responded to Brockmannn's complaint in writing. Malyszek Dep. at 88.[1]

Brockmannn successfully completed his PIP while his appeal was pending. Kendrick Dep. at 53. Brockmannn also was successful in having his PIP overturned by Human Resources on the basis that certain information in Brockmannn's reviews had come from an outside contractor in violation of company policy. Id. at 53-54.

---

[1] During this time period there was a reorganization in the Information Technology Department, and Brockmann was assigned a new manager, Richard Altamiri ("Altamiri"). However, Malyszek continued to supervise Brockmann's PIP.

Brockmannn's new superior, Altamiri, complained to Neville, asserting that Plaintiff had placed Brockmannn on the Low Performer list in retaliation for Brockmannn's complaints about Harkola two years earlier.   Brockmannn himself also complained to Human Resources that he believed he was listed as a Low performer in retaliation for reporting Plaintiff for having made offensive comments in 2006.

### E.   The Retaliation Claim Against Harkola and Harkola's Termination

In late August of 2008, while Human Resources was determining whether to change Brockmannn's performance rating, Brockmannn's new manager, Altamiri, registered a complaint with Neville about Harkola. According to Altamiri, Harkola was retaliating against Brockmannn by placing him on a PIP because Harkola believed that Brockmannn had been involved in the 2006 sexual harassment complaint against Harkola. Neville Dep. at 22-23. Altamiri alleged that Harkola had made comments to him to the effect that they "should get rid of" Brockmannn, and that he (Harkola) knew that Brockmannn had reported him to Human Resources. Id. Altamiri also felt Harkola was pressuring him to ensure Brockmannn would be unsuccessful in his PIP. Neville Dep. at 35. In addition to reporting the matter to Human Resources, Neville reminded Harkola that the objective of a PIP is to ensure the employee is successful and that he needed to support Brockmannn through that process.  Id. at 19, 36.

At the same time, Brockmannn had complained to Human Resources that he believed he was placed on a PIP in retaliation for making the 2006 complaint against Harkola. Kendrick Dep. at 33. Based on the complaints by Altamiri and Brockmannn, Kendrick began investigating a potential claim of retaliatory treatment by Harkola. Id. at 33-34; Neville Dep. at 19. In this regard, Kendrick called Harkola to schedule a meeting with him, reminding Harkola that the meeting was confidential and asking him not to speak to anyone about it. Kendrick Dep. at 45; 62-63.

Shortly after Kendrick's phone call to Harkola, Altamiri approached Neville a second time and told him that Harkola had called him (Altamiri) at home and asked if Altamiri had reported him to Human Resources. Neville Dep. at 29. Altamiri also told Kendrick about the incident, which he found threatening. Kendrick Dep. at 63.

In addition to Harkola's phone call to Altamiri, Neville reported Harkola's comments about wishing to see Brockmann terminated to Human Resources. Neville Dep. at 29, 33-34.

Kendrick continued to investigate by speaking to Brockmannn, Altamiri, Malyszek, and Stewart. Kendrick Dep. at 33-40. Kendrick also spoke to Teresa Hannah ("Hannah"), one of Harkola's subordinates; and Mary Lynn Cardone-Zarr ("Cardone-Zarr"), one of Brockmann's co-workers. Kendrick reviewed the performance evaluations of Harkola's subordinates from previous years to see if

there was any evidence of retaliation in those reviews. Id. at 52-53.

Finally, Kendrick met with Harkola and specifically asked him if he had spoken to anyone regarding the meeting or the investigation. Harkola stated that he had only talked to Neville and denied speaking to anyone else. Kendrick Dep. at 64. At his deposition, however, Harkola admitted that he called Altamiri at home and asked if Altamiri had reported him (Harkola) to Human Resources. Harkola Dep. at 116, 118.  Harkola explained that he wanted to know if Altamiri had called Kendrick to complain about him. Id. 120-22.  Harkola acknowledged that as a general rule he believes managers should keep such complaints confidential and that failure to do so could discourage people from bring legitimate complaints.  Id. at 99.

Once Kendrick concluded her investigation, she met again with Neville to discuss Human Resources' recommendations regarding Harkola. Neville Dep. at 19. Although Human Resources did not find sufficient evidence to prove that Harkola was intentionally retaliating against Brockmannn, it did find sufficient evidence to conclude that Harkola had exercised poor judgment as a manager. Neville Dep. at 19-20; Kendrick Dep. at 65-66. Accordingly, Human Resources recommended that Harkola be suspended for four weeks. Neville Dep. at 20.  This recommendation was based upon the following factors: (1) Harkola's failure to comply with the directive that he maintain confidentiality with regard to the 2006

sexual harassment investigation; (2) Harkola's failure to comply with the directive that he maintain confidentiality for the 2008 retaliation investigation; (3) Harkola's pressure on Altamiri to terminate Brockmann; (4) Harkola's apparent intimidation of Altamiri during the 2008 retaliation investigation; and (5) Harkola's poor management and communication styles. Neville Dep. at 25.

Neville disagreed with the suspension-only recommendation and instead recommended that Harkola be terminated. Neville based his recommendation on Harkola's repeated failure to maintain confidentiality for the two Human Resources investigations and his exercise of poor judgment in a management position. Neville Dep. at 29. Neville testified that, in particular, Harkola's call to Altamiri inquiring if Altamiri had reported Harkola to Human Resources was threatening and "showed extremely poor judgment." Id. After further discussion, Human Resources agreed with Neville's recommendation. Kendrick Dep. at 67.

In October 2008, Harkola was terminated. Neville Dep. at 40. In November 2008, he filed a charge of discrimination with the Equal Employment Opportunity Commission.

### F.   The Proceedings in This Court

On June 18, 2009, Plaintiff filed this action alleging (1) that he was terminated on the basis of his gender, and (2) that Defendant retaliated against him because he participated

in Defendant's investigation into Brockmann's claim of retaliation by Plaintiff. <u>See</u> Complaint, ¶¶25-28 (Dkt #1).

Defendant has moved for judgment on the pleadings, arguing that Plaintiff has not established a <u>prima</u> <u>facie</u> case of discrimination with respect to any of his claims. Defendant further argues that, even if Plaintiff has established a <u>prima</u> <u>facie</u> case of discrimination, Defendant has articulated legitimate, non-discriminatory reasons for terminating Plaintiff's employment, which Plaintiff has failed to rebut.

Plaintiff opposes Defendant's motion, arguing that there are material issues of fact in dispute with respect to his discrimination and retaliation claims which preclude granting the motion for summary judgment.

## III. Discussion

### A.   Standard for Summary Judgement Under Rule 56(c) of the Federal Rules of Civil Procedure

A motion for summary judgment pursuant to Rule 56(c) may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The burden rests on the moving party to demonstrate the absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

In deciding whether summary judgment is appropriate, the court resolves all ambiguities and draws all permissible factual inferences against the movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Summary judgment is warranted when the nonmovant has no evidentiary support for an essential element on which it bears the burden of proof. Celotex, 477 U.S. at 322-23; see also Silver v. City Univ. of N.Y., 947 F.2d 1021, 1022 (2d Cir. 1991). The "mere existence of a scintilla of evidence" supporting the non-moving party's cause is insufficient. Anderson, 477 U.S. at 252. Nor may summary judgment be defeated merely on the basis of a "metaphysical doubt" or "conjecture or surmise." Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The non-moving party may not rely on evidence that is merely colorable, conclusory, or speculative but must come forward with "concrete evidence from which a reasonable jury could return a verdict in [his] favor." Anderson, 477 U.S. at 256.

"Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) (citations and internal quotations omitted). However, a plaintiff may not defeat a motion for summary judgment merely by relying upon "purely conclusory allegations of discrimination, absent any concrete particulars." Meiri v. Dacon,

759 F.2d 989, 998 (2d Cir. 1985), <u>cert. denied</u>, 474 U.S. 829 (1986).

**B.  Elements of a <u>Prima Facie</u> Case of Gender Discrimination Under Title VII**

Claims of employment discrimination brought under Title VII are analyzed under the burden-shifting framework set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). <u>Reeves v. Sanderson Plumbing Prods.</u>, 530 U.S. 133, 142-43 (2000). NYSHRL claims are analytically identical to claims brought under Title VII. <u>Van Zant v. KLM Royal Dutch Airlines</u>, 80 F.3d 708, 714-15 (2d Cir. 1996) (citations omitted).

To establish a <u>prima facie</u> case of employment discrimination, a plaintiff must show (1) that he belonged to a protected class; (2) that he was qualified for the position he held; (3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination. <u>Shumway v. United Parcel Service, Inc.</u>, 118 F.3d 60, 63 (2d Cir. 1997). If the plaintiff succeeds in stating a <u>prima facie</u> case, the burden of production shifts to the employer, who must offer a legitimate, non-discriminatory reason for the employment action. <u>Id.</u> (citation omitted). Specifically, the employer "'must clearly set forth, through the introduction of admissible evidence,' reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." <u>St.</u>

Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993) (quoting Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254-55, 255 n.8 (1981)).

"If the employer successfully articulates such a reason, the plaintiff has the burden of proving that the proffered reason is merely a pretext for discrimination." Id. (citation omitted); see also Burdine, 450 U.S. at 252-53. "once the employer has proffered its nondiscriminatory reason, the employer will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." James v. New York Racing Ass'n, 233 F.3d 149, 54 (2d Cir. 2000) (citing, inter alia, St. Mary's, 509 U.S. at 510-11). The "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Burdine, 450 U.S. at 253; see also Bickerstaff v. Vassar Coll., 196 F.3d 435, 446 (2d Cir. 1999).

## C. Plaintiff Has Failed to Establish a Prima Facie Case of Discrimination Under Title VII.

The parties agree that Harkola was subjected to an adverse employment action, but disagree as to (1) whether he is a member of a protected class, (2) was qualified for his position, and (3) was fired under circumstances giving rise to an inference of discrimination.

### 1.   Membership in a Protected Class

Plaintiff is a white male complaining of gender-based discrimination in his termination, a decision which was made by another white male, Neville. Although the Second Circuit has not yet established the standard to be applied to reverse gender discrimination claims, see Seils v. Rochester City Sch. Dist., 192 F. Supp.2d 100, 109 (W.D.N.Y. 2002), several district courts in this Circuit have adopted the standard articulated by the District Columbia Circuit Court of Appeals that the plaintiff must adduce evidence of background circumstances supporting the suspicion that the defendant is that unusual employer who discriminates against a favored group. Parker v. Balt. & Ohio R.R. Co., 652 F.2d 1012, 1017 (D.C. Cir. 1981) (cited with approval in Olenick v. New York Tel., 881 F. Supp. 113, 114 (S.D.N.Y. 1995)). Others district courts in this Court have not adopted the Parker standard. E.g., Ticali v. Roman Catholic Diocese of Brooklyn, 41 F. Supp.2d 249, 260-62 (E.D.N.Y. 1999). See generally Brierly v. Deer Park Union Free Sch. Dist., 359 F. Supp.2d 275, 294 n. 7 (E.D.N.Y. 2005) (discussing the two different approaches).

The correct standard need not be determined in this case, since, as discussed more fully, infra, Plaintiff has failed to show that Defendants' non-discriminatory reasons for their actions were pretextual. Accord Brierly, 359 F. Supp.2d at 294 (declining to determine which standard applies in reverse discrimination case because plaintiff had failed to establish pretext). Were this Court to apply the stricter standard from Parker, however, it would find

the following factors significant in showing that USSC was not one of those unusual employers who discriminates against a favored group. First, the entire senior information technology ("IT") team at USSC was male. Second, as Harkola admitted, each male employee who was placed on a PIP was the weakest member of his team. See Harkola T.39-46 (discussed in Defendant's Memorandum of Law at 11 (Dkt #12-12). Third, Harkola has not suggested or proven that women who were promoted or offered positions were less qualified than their male counterparts. Fourth, the adverse employment action taken against Harkola (i.e., his termination) resulted when his male supervisor (Neville) overruled the less severe sanction recommended by the female Human Resources manager (Kendrick). As noted above, Kendrick (a female), had recommended only a four-week suspension, while Harkola's immediate superior, Neville, decided that he should be fired immediately.

## 2.   Plaintiff's Qualification For His Position

Defendants incorrectly have conflated the issue of whether Harkola was qualified for his position with the issue of whether Defendants had a legitimate, non-discriminatory reason for firing him. Plaintiff was qualified for his position, as he had been performing it in a generally satisfactory manner for numerous years. Plaintiff thus has fulfilled this element of a prima facie case.

### 3. Circumstances Giving Rise to an Inference of Discrimination

In the usual case, a party establishes an inference of discrimination by demonstrating that other similarly situated persons, not of Plaintiff's protected class, were treated more favorably than him in the workplace. Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 467 (2d Cir. 2001). Harkola relies upon this method here.

To establish a prima facie case based on disparate treatment, a plaintiff must bring forth some evidence that other similarly situated employees who do not belong to his protected class were terminated or did not suffer an adverse employment action for the same reasons as the plaintiff. See Hill v. Rayboy-Brauestein, 467 F. Supp.2d 336, 356 (S.D.N.Y. 2006) (where plaintiff alleged disparate treatment based on her race because she was not allowed to return to work when she was unable to fully perform her duties and who was suspended for insubordination, she was required to bring forth some evidence, to establish her prima facie case based on disparate treatment, that similarly situated employees who did not belong to her protected class were allowed to return to work prior to being able to fully perform their duties, and that other employees who do not belong to her protected class were not given suspensions for insubordination).

### a. Disparate Treatment of a Female Employee Who Approved Placement of Brockmannn on a PIP

As an initial matter, it is undisputed that during his five-year tenure at USSC, Harkola was not treated less favorably than

female employees with respect to his employment conditions, salary, or benefits. The only incident in which he alleges disparate treatment is his termination. Specifically, Plaintiff alleges that he was subjected to disparate treatment because he purportedly was terminated as a result of approving Brockmannn's placement on a PIP, while a female employee, Malyszek, who also recommended Brockmannn for a PIP, was not terminated.

Plaintiff thus relies solely on Malyszek as a comparator in arguing that evidence of less favorable treatment gives rise to an inference of discrimination. The Court is not convinced that Malyszek is a proper comparator as she was not at the same level as Plaintiff in the corporate hierarchy at USSC. See Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000)("[T]he plaintiff must show [that] she was 'similarly situated in all material respects' to the individuals with whom she seeks to compare herself.'") (quoting Shumway, 118 F.3d at 63).

However, even assuming that Malyszek was a proper comparator, USSC has identified valid reasons for terminating Plaintiff. Fatal to Plaintiff's claim is that his placement of Brockmannn on a PIP was not one of the reasons he was fired. In particular, USSC has submitted the results of its internal investigation which determined that Harkola did not act inappropriately or in a retaliatory manner when he approved Brockmannn for the Low Performer list. In other words, contrary to Plaintiff's contention, USSC has never sanctioned him for placing Brockmannn on a PIP. Indeed, even Neville, Plaintiff's superior, testified that

he agreed Brockmannn should be placed on a PIP. Plaintiff has not produced any evidence suggesting that USSC believed he acted inappropriately with respect to placing Brockmannn on the Low Performer list. Likewise, the record is devoid of evidence that Plaintiff's review of Brockmannn played any role in Plaintiff's termination.

Even assuming that Harkola could establish that he was terminated for having placed Brockmannn on the Low Performer list, which the Court explicitly finds he has not done, see supra, he nevertheless has failed to show that firing him for this reason would give rise to an inference of gender discrimination. Although Plaintiff does assert that he was treated differently than a female employee who also recommended that Brockmannn be placed on a PIP, Plaintiff has failed to come forward with any evidence that he was treated differently because of his gender. See Grant v. Bethlehem Steel Corp., 635 F.2d 1007, 1013-14 (2d Cir. 1980) ("[D]iscriminatory or disparate treatment in violation of Title VII occurs where '[t]he employer simply treats some people less favorably than others because of their race, color, religion, sex or national origin. Proof of discriminatory motive is critical . . . .'") (quoting International Brotherhood of Teamsters v. United States, 431 U.S. 324, 335-36 n.15 (1977) (emphases supplied)).

### b. Circumstances Other Than Alleged Disparate Treatment Relevant to Showing Discrimination

Absent evidence of disparate treatment, Plaintiff must submit some evidence that creates a genuine issue as to whether his

termination was motivated by gender bias or animus. See Grillo v. New York City Transit Auth., 291 F.3d 231, 235 (2d Cir. 2002) (dismissing plaintiff's Title VII claim for racial discrimination because the plaintiff failed to submit evidence of racial animus on the part of those involved in his termination); Patterson v. County of Oneida, N.Y., 375 F.3d 204, 212-13, 221-24 (2d Cir. 2004)(concluding that the plaintiff did not present evidence giving rise to inference of discrimination when plaintiff showed a past pattern of racially hostile conduct by co-workers but failed to provide any evidence of bias on part of the individuals who made decision to terminate him).

### 1.) Failure to Place Malyszek, a Female Employee, on a PIP

Harkola contends that the failure of USSC to place Malyszek on a PIP gives rise to an inference of discrimination. As noted, Malyszek was a female and one of the managers on Harkola's team. However, Harkola admitted that he was the individual who would have been responsible for reviewing Malyszek's performance and placing her on a PIP if warranted. See Harkola Dep. at 49-50. As Harkola further conceded, he never rated her as a Low Performer. Id. This contention is specious.

### 2.) Disproportionate Number of Male Employees Placed on PIPs

Harkola has attempted to demonstrate discrimination by asserting that a disproportionate number of male employees as compared to female employees were placed on PIPs. At his deposition, Harkola identified the male employees he had placed on

PIPs at Neville's direction in 2006, 2007, and 2008. In each case, however, Harkola testified that these male employees were the lowest performing members of his team. See Harkola Dep. at 39-46 (discussed in Deft. Mem. at 11) (Dkt. #12-2)). As Harkola concedes, placing these employees on PIPs was warranted given their substandard job performances. There is absolutely no evidence the decisions were motivated by reverse gender discrimination. Id.

### 3.) Male Employees More Likely To Be Placed On PIPs

Plaintiff also asserts that an inference of discrimination against male employees can be drawn from his unsupported contention that male employees at USSC were more likely than female employees to be considered Low Performers and placed on PIPs. Harkola has not substantiated this contention. Rather, the record establishes that USSC's departmental managers were required to place the lowest five percent of the employees under their management on the Low Performer list, and that rankings were determined by semi-annual evaluation scores. The managers responsible for determining which employees were to be placed on the list were both male and female, and there is no evidence that the managers either colluded among themselves, or were directed by their superiors, to place more male employees on the Low Performer list. Plaintiff's claim that male employees were more likely to be placed on the Low Performer list than female employees is unsupported by any evidence that the reason for being placed on the list was their gender, rather than their substandard performance.

### 4.) Discriminatory Treatment of Male Employees Who Placed Brockmannn on the Low Performer List

Plaintiff asserts that other male employees who placed Brockmannn on the Low Performer list was treated differently than female employees. This contention is belied by the record. The only other male employee who rated Brockmannn as a Low Performer was Neville, who is also male. Plaintiff concedes that no adverse employment action was taken against Neville.

### 5.) Allegedly Improper Method of Achieving Workplace Diversity

Harkola suggests that an inference of discrimination can be detected in USSC's alleged policy of increasing diversity in his department. He stated at his deposition that he disagreed with Neville's decisions to seek out female job candidates and promote certain female employees. These allegations utterly fail to give rise to an inference of gender discrimination.

In sum, Harkola has failed to adduce any evidence that female employees whom Neville sought to promote were less qualified than their male counterparts or that their gender was the reason for their career advancement. Harkola also admitted that increasing diversity was a positive step for the company to take.

Although Harkola contends that he was fired in order to make a senior position available for a female candidate, he conceded that his position was not filled by a woman and that this belief was based solely on "conjecture[,]" Harkola Dep. at 109. As courts have stated many times, "[m]ere conjecture or speculation by the

party resisting summary judgment does not provide a basis upon which to deny" the motion. Argus Inc. v. Eastman Kodak Co., 801 F.2d 38, 42 (2d Cir. 1986) (internal quotation marks omitted); accord, e.g., Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).

### D. Defendants Have Offered Legitimate, Non-Discriminatory Reasons For Terminating Plaintiff's Employment

Even if Plaintiff could state a prima facie case of gender discrimination, Defendant has proffered legitimate, non-discriminatory reasons for terminating his employment, and Plaintiff has failed to show that they were merely pretextual.

#### 1. Defendant's Proffered Reasons

Defendants argue that Harkola's supervisor, Neville, clearly set forth at his deposition the reasons for Harkola's termination-namely, because over the course of two years, he exhibited several lapses in judgment. Neville testified in relevant part as follows:

> It really came down to the question of judgment, where we had now two repeated in a two-year timeframe-flaws in judgment, errors in judgment from Mr. Harkola's perspective, and it was a case where Mr. Harkola was in a management position, responsible for 50 to 60 employees and had influence over a lot of people, and I felt we couldn't have a person in the leadership position responsible for that type of budget, that type of team, having repeated judgment errors the way that Mr. Harkola has.

Neville Dep. at 29. Neville then identified the pertinent errors in judgment made by Harkola as (1) failing to maintain confidentiality regarding the 2006 sexual harassment investigation into comments by Harkola; (2) failing to maintain confidentiality regarding the 2008 retaliation investigation; (3) pressuring Altamiri to terminate

Brockmannn while Brockmannn was on a PIP; and (4) stating to Neville that he (Harkola) wanted to terminate Brockmannn while he was on a PIP. Neville Dep. at 29-34. See Dorcely v. Wyandanch Union Free School Dist., 665 F.Supp.2d 178, 199 (E.D.N.Y. 2009) (failure to follow employer's procedures and policies and inappropriate work place behavior constitute legitimate nondiscriminatory reasons for terminating employment)

### 2. Plaintiff Has Failed to Rebut Defendants' Legitimate, Non-Discriminatory Reasons

Plaintiff disputes the validity of Defendants' proffered reasons, asserting that Neville essentially conceded that Plaintiff's termination was pretextual. As support for this contention, Plaintiff points to one answer given by Neville at his deposition: In response to Plaintiff's attorney's question as to whether the termination was pursuant to "any company policy," Neville replied, "No, it was not a question of company policy, no." Neville Dep. at 53. Plaintiff neglects to mention that Neville then went on to explain in detail the basis for his recommendation-namely, what he perceived to be serious errors in judgment by Harkola in several different situations. See id., at 53-54. Neville explained,

> My recommendation was based on the fact that we had a member of our senior management team who had a prior failure in judgment in 2006 and now a subsequent failure in judgment in 2008 that has a direct-would have a direct impact on his time and his ability to lead his team, and I think that circumstance, additional suspension wasn't awarded [sic]. From my perspective, senior members of a management team need to be held to a certain standard, and you can't be in a situation where you're constantly questioning if that manager is going to put the company

in jeopardy. When we got to the point of a recommending a second four week suspension, I said, no, we had a second failure of judgment here, and I think we need to terminate.

Neville Dep. at 53.

"A business decision need not be good or even wise. It simply has to be nondiscriminatory. . . ." Graefenhain v. Pabst Brewing Co., 827 F.2d 13, 17 (7th Cir. 1987) , overruled on other grounds, Coston v. Plitt Theatres, Inc., 860 F.2d 834, 836 (7th Cir. 1988); accord Dister, 859 F.2d at 1116 (citation omitted)). An employee's poor judgment has been held to be a legitimate, non-discriminatory reason for termination. See Woods v. Enlarged City Sch. Dist. of Newburgh, 473 F.Supp.2d 498, 526 (S.D.N.Y. 2007) ("Plaintiff . . . has failed to submit any evidence that reasonably supports the finding that the District's purported justification was a pretext for racial discrimination. . . . [D}efendants have shown that the District terminated plaintiff because she exercised poor judgment in directing two, over the course of two business days, voluminous copies of student records, teachers' evaluations and memoranda which she subsequently brought home with her without any prior administrative approval or school-related purpose.").

As noted above, the 2006 incident referenced by Neville involved Harkola making three sexually inappropriate comments at the workplace, which resulted in a Human Resources investigation, subsequent censure of Harkola for violating the company's anti-sexual harassment policy, and Harkola's apology to the three employees for having made them uncomfortable.

The 2008 incident mentioned by Neville was the Human Resources investigation into the retaliation claim brought by Brockmannn. As in the 2006 investigation, when Harkola breached the company's confidentiality policy by contacting co-workers and asking them whether they had reported him to Human Resources, Harkola again breached the confidentiality policy in the same manner during the 2008 investigation. An employee's repeated disregard for company policy and breach of that policy despite having been cautioned in the past about it does not demonstrate good judgment.  Harkola admitted at his deposition that questioning employees about Human Resources complaints could result in intimidation and could deter other employees from reporting discrimination.[2]

The incidents giving rise to Neville's assessment that Harkola lacked the necessary judgment to be an effective manager are well documented in the record.  For example, as discussed above, investigations at USSC regarding personnel matters are and were required to be kept confidential by all participants in the investigation. Following an internal investigation, USSC documented two (2) separate occasions on which Harkola violated this policy by confronting co-employees who either had made complaints or participated in an investigation.

In his deposition, Neville explained that he observed repeated instances of poor judgment on Harkola's part in 2006 and 2008,

---

[2]

An additional example of poor judgment, Plaintiff refused to work to help an employee succeed on his PIP, again in violation of the company's policy of helping employees designated as Low Performers increase their ratings.

which supports Defendants' position that an employee's poor judgment is a legitimate, non-discriminatory reason for taking an adverse employment action against him. Furthermore, Harkola was terminated by a male, and his position was not filled by a woman. Plaintiff has completely failed to rebut USSC's legitimate, non-discriminatory reasons for firing him and has not presented sufficient evidence from which a rational jury could determine that he was the target of gender discrimination.

"A jury cannot infer discrimination from thin air." Norton v. Sam's Club, 145 F.3d 114, 145 (2d Cir.), cert. denied, 119 S.Ct. 511 (1998). Plaintiff has come forward with nothing more than conclusory allegations of discrimination and therefore has failed to establish a genuine issue of material fact so as to preclude granting of a motion for summary judgment on his claim of gender discrimination. Anderson, 477 U.S. at 249.

## E. Plaintiff Has Failed to Establish a Prima Facie Case of Retaliation Under Title VII.

Plaintiff alternatively claims that his employment was terminated because he participated in the 2008 investigation into Brockmannn's claim that Plaintiff had retaliated against Brockmannn by placing him on the Low Performer list. Harkola claims that his participation in the investigation constituted "protected activity" under Title VII, and that USSC fired him for participating in the investigation.

1.   **Elements of a Prima Facie Case of Retaliation Under
     Title VII**

As in Title VII discrimination cases, claims of retaliation
are analyzed according to the burden-shifting framework set forth
in McDonnell Douglas Corp. Reed v. A.W. Lawrence & Co., Inc., 95
F.3d 1170, 1178 (2d Cir. 1996). To establish a prima facie case of
retaliation, a plaintiff must show that (1) he participated in a
protected activity; (2) the employer was aware of the activity;
(3) an adverse employment action was taken against him; and (4) a
causal connection exists between the protected activity and adverse
action. Papelino v. Albany Coll. of Pharmacy of Union Univ., 633
F.3d 81, 91 (2d Cir. 2011).  As the Second Circuit has held,
"implicit in the requirement that the employer have been aware of
the protected activity is the requirement that it understood, or
could reasonably have understood, that the plaintiffs opposition
was   directed   at   conduct   prohibited   by   Title   VII."
Galdieri-Ambrosini v. National Realty & Dev. Corp., 136 F.3d 276,
292 (2d Cir. 1998).

"The plaintiff is only required to have had a good faith,
reasonable belief that he was opposing an employment practice made
unlawful by Title VII." McMenemy v. City of Rochester, 241 F.3d
279, 285 (2d Cir. 2001) (citation omitted). A plaintiff "may state
a prima facie case for retaliation even when [his] primary claim
for discrimination is insufficient to survive summary judgment."
Wimmer v. Suffolk County Police Dep't., 176 F.3d 125, 135 (2d
Cir.), cert. denied, 528 U.S. 964 (1999).

### a.   "Protected Activity"

An employee asserting a retaliation claim must either demonstrate that he "opposed" a discriminatory practice or that he "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." Crawford v. Metropolitan Gov't of Nashville & Davidson Cty, Tenn., 129 S. Ct. 846, 850 (2009) (quoting 42 U.S.C. § 2000e-3(a) (quotation marks omitted)).  The "opposition" clause of Title VII requires that the employee has taken, or threatened to take, some action to protest or oppose illegal discrimination. Deravin v. Kerik, 335 F.3d 195, 204 (2d Cir. 2003). "Opposition" for purposes of Title VII retaliation can include informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry, and expressing support of co-workers who have filed formal charges. Sumner v. United States Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990).

The Supreme Court explained in Crawford that the "term 'oppose,' being left undefined by the statute, carries its ordinary meaning, Perrin v. United States, 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979): 'to resist or antagonize . . . ; to contend against; to confront; resist; withstand," WEBSTER'S NEW INTERNATIONAL DICTIONARY 1710 (2d ed.1958)." Crawford, 129 S. Ct. at 850. "Although these actions entail varying expenditures of energy, 'resist frequently implies more active striving than oppose.'" Id. (quotation omitted; citation omitted). An employee can "oppose"

discrimination in the workplace, and thus, come under the protection of the antiretaliation provision of Title VII, by responding to someone else's question about the discrimination, just as surely as by initiating the discussion. <u>Crawford</u>, 129 S. Ct. at 851.

Defendants argue nothing that Harkola did may reasonably be construed as "opposing" discrimination because, during his meeting with Human Resources in connection with the 2008 investigation of retaliation based on the complaint by Brockmannn, he did not make any complaints of discrimination to Kendrick. Harkola did not support the claims of Brockmannn, Altamiri, or any other individual asserting a claim of treatment violative of Title VII.

From what the Court can discern, Plaintiff asserts that he "opposed" discrimination because Altamiri's claim of retaliation in 2008 was determined to be unfounded. In light of <u>Crawford</u>, the Court does not agree that Plaintiff's reading of "oppose", is correct.   Under Plaintiff's construction, whether or not he "opposed" discrimination in the workplace would depend on the outcome of the investigation–that is, whether the discrimination charge was found to be meritless or not. This is not a reasonable reading of <u>Crawford</u>.  Plaintiff has failed to present any evidence that he "opposed" or "protested" any form of discrimination, and that even if he had, that this opposition would have been supported by good faith belief in the underlying claims. Thus, Plaintiff has not met the requirements of the opposition clause. <u>See</u> <u>Deravin</u>, 335 F.3d at 203 (to meet the requirements of narrower opposition clause

"plaintiff himself must have taken some action to protest or oppose illegal discrimination").

Defendants have overlooked Title VII's "participation" clause, arguing that the law requires that an employee "oppose" discrimination during the employer's investigation. With regard to the broader "participation" clause of Title VII, the Second Circuit has recognized its explicit language as being "expansive and seemingly contain[ing] no limitations." Deravin, 335 F.3d at 203 (citations omitted).  According to the Second Circuit, the words "participate in any manner" express a legislative intent to confer "exceptionally broad protection" upon employees involved in a Title VII proceeding. Id.  Following the reasoning of other circuits, the Second Circuit "discern[ed] no absurdity or necessary inconsistency in barring retaliation based on an accused harasser's participation in Title VII proceedings." Id. at 204.  Accordingly, the Second Circuit held that "defending oneself against charges of discrimination-to the extent that such defense involves actual participation in a Title VII proceeding or investigation-is 'protected activity' within the scope of § 704(a)[, 42 U.S.C. § 2000e-3(a),] based on a plain reading of the statute's text." Id. (comparing with McMenemy v. City of Rochester, 241 F.3d 279, 283 (2d Cir. 2001) (refusing to adopt a limitation which was not supported by the plain language of Title VII's anti-retaliation provision)).

Under Deravin, it appears that Plaintiff did "participate"-albeit involuntarily, as the accused-in several of USSC's

investigations into alleged harassing and retaliatory conduct. However, he cannot show the requisite causal connection between his "participation" in the 2006 and 2008 investigations and his termination.

### b.   Causal Connection

Assuming that Harkola engaged in protected activity, his claim still does not pass muster because he cannot make a sufficient showing of a causal connection between his participation in the Human Resources investigations and his termination. A plaintiff can show a sufficient causal connection between the protected activity and the adverse employment action either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by defendant." Gordon v. New York City. Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000).

As with his discrimination claims, Plaintiff has provided no direct evidence of a retaliatory motive for his termination apart from his own conclusory and conjectural allegations, which are plainly insufficient to defeat Defendants' motions for summary judgment. See Cobb v. Pozzi, 363 F.3d 89, 108 (2d Cir. 2004) ("[A] plaintiff may not rely on conclusory assertions of retaliatory motive to satisfy the causal link. Instead, he must produce 'some tangible proof to demonstrate that [his] version of what occurred

was not imaginary.'") (internal citations omitted; alterations in original).

Any suggestion by Plaintiff that an employee who defends himself in a sexual harassment or retaliation investigation cannot be disciplined is incorrect as a matter of law. "[W]hile an employer may not retaliate against an employee solely because the employee participated in a Title VII proceeding, an employer may discipline an employee if its investigation reveals culpable conduct." <u>Deravin</u>, 335 F.3d at 205. USSC was not prohibited from disciplining Harkola, who legitimately had been found to have engaged in discriminatory or harassing conduct, even where Harkola had "participated" in an investigation into that same conduct. <u>See id.</u>

Because Harkola has failed to come forward with any competent evidence to prove that USSC acted with a discriminatory animus towards him, he must rely on the alleged closeness in time between the protected activity and the adverse employment action. <u>Woods</u>, 473 F. Supp.2d at 528 (citing <u>Butler v. Raytel Medical Corp.</u>, 150 Fed. Appx. 44, 47, 2005 WL 2365340, at **1 (2d Cir. Sept. 27, 2005)("Where there is no direct evidence of a causal relationship, a plaintiff may show a causal relationship by showing temporal proximity.")).

The Supreme Court has noted that the cases accepting "mere temporal proximity between the employer's knowledge of protected activity and an adverse employment action as sufficient causality to establish a <u>prima facie</u> case uniformly hold that the temporal

proximity must be 'very close.'" <u>Clark County Sch. Dist. v.</u>
<u>Breeden</u>, 532 U.S. 268, 273-74 (2001) (quotation and citations
omitted). The Second Circuit "has not drawn a bright line to define
the outer limits beyond which a temporal relationship is too
attenuated to establish a causal relationship. . . ." <u>Gorman-Bakos</u>
<u>v. Cornell Coop. Ext'n of Schenectady County</u>, 252 F.3d 545, 554 (2d
Cir. 2001) (finding that a lapse of four months is insufficient to
defeat plaintiff's claim of retaliation). Notably, the district
courts in the Second Circuit to have considered this issue have not
approved time periods longer than four months, and one district
court has stated that "[t]hree months is on the outer edge of what
courts in this circuit recognize as sufficiently proximate to admit
of an inference of causation[.]" <u>Yarde v. Good Samaritan Hosp.</u>,
360 F. Supp.2d 552, 562 (S.D.N.Y. 2005). <u>See</u> <u>generally</u> <u>Woods</u>, 473
F.Supp.2d at 529 (collecting cases).

The Human Resources investigations here took place in 2006 and
2008. With regard to the investigation in 2006, there was a delay
of nearly two years between Harkola's "participation" and the
adverse employment action. This is far too attenuated to
demonstrate causation based on chronology alone. Where the timing
of events is offered to establish indirectly a causal connection
between an employee's act and its alleged consequences, the Second
Circuit has rejected time periods greater than one year in
retaliation claims. <u>Butler v. Raytel Medical Corp.</u>, 150 Fed.Appx.
at 47, 2005 WL 2365340, at **1 ("The district court also properly
concluded that Butler failed to produce evidence of a causal

connection between the protected activity and the adverse action.
Butler offered no evidence that his supervisors ever became aware
of his complaint, other than his apparent speculation that his
supervisors inferred that sensitivity trainings and meetings had
been triggered by his complaints to Human Resources . . . . Where
there is no direct evidence of a causal relationship, a plaintiff
may show a causal relationship by showing temporal proximity, but
here approximately one year elapsed between the purported complaint
and the adverse employment action, Butler's firing.") (internal
citation omitted).

With regard to the 2008 investigations, Harkola has not
offered any evidence from which a reasonable factfinder could
conclude that it was his <u>participation</u> in the investigation that
led to his termination. Rather, it was the outcome of the
investigation–which revealed repeated instances of poor judgment on
his part–that led to his termination. <u>See</u> <u>Deravin</u>, 335 F.3d at 205
("We emphasize that Title VII only protects the specific act of
<u>participating</u> in administrative proceedings–not the underlying
conduct which is being investigated.") (emphasis in original).

### c.   Lack of Pretext

Defendants have met their burden of production by offering
admissible evidence in support of their legitimate,
nondiscriminatory reasons for terminating Plaintiff. Accordingly,
the burden shifts back to plaintiff "to show that the reason was
merely a pretext for discrimination." <u>Chambers v. TRM Copy Centers</u>
<u>Corp.</u>, 43 F.3d 29, 38 (2d Cir. 1994). "A reason cannot be proved to

be a pretext . . . unless it is shown both that the reason was false, and that discrimination [or retaliation] was the real reason." St. Mary's Honor Center, 509 U.S. at 515 (emphases and internal quotation marks omitted). Nevertheless, "[s]ummary judgment is appropriate . . . only if the employer's nondiscriminatory reason is dispositive and forecloses any issue of material fact." Id.

The Court finds that there is insufficient evidence for a reasonable jury to conclude that Defendants' proffered reasons for terminating Plaintiff were actually a pretext for retaliation. Rather, as discussed at length above, the circumstances that purportedly would demonstrate discriminatory animus or motive by Plaintiff's employer have been shown to be unsupported by the record and based solely on Plaintiff's conjecture and conclusory opinions. Meiri,759 F.3d at 998. Because the evidence as a whole is insufficient to sustain a reasonable finding that Defendants' proffered reasons for terminating Plaintiff were a pretext for retaliation, Plaintiff's retaliation claim is dismissed.

### F.    Propriety of Including Energy East as Party

Plaintiff asserts that Energy East and USSC were a "single employer/integrated enterprise". Defendants argue that Energy East, which was a holding company and had no employees, cannot be held liable for alleged employment discrimination against Harkola. Defendants point out that it is undisputed that when Harkola was employed by USSC, he was supervised by, and worked with, USSC employees. Neville, a USSC employee, made the ultimate decision to

terminate Harkola. Defendants argue that there is no claim against Energy East because it was not Harkola's employer.

Plaintiff asserts that there is sufficient evidence in the record to demonstrate that Energy East and USSC are a single enterprise. Plaintiff notes that Energy East created USSC to consolidate support-service functions for six regulated utilities owned by Energy East. Neville, the Vice President of IT at USSC, is also a corporate officer at Energy East. Pl. Reply Mem. at 17 (citing Vol. I, Ex. A, at 14). Plaintiff reasons that because Energy East was solely a holding company without employees, "the business conducted by USSC is the business conducted by Energy East, thereby making Energy East an employer for the purposes of Title VII." Id.

The Court need not determine whether Energy East was improperly named as a party because, for the reasons discussed above, Defendants have borne their burden of demonstrating the absence of any material issue genuinely in dispute with regard to Plaintiff's claims. The Complaint therefore must be dismissed in its entirety as to both defendants.

**IV.  CONCLUSION**

For the reasons set forth above, the Court grants Defendants' Motion for Summary Judgement (DKt #12). Plaintiff's Complaint (Dkt #1) is hereby dismissed with prejudice.

**SO ORDERED.**

S/Michael A. Telesca

_____
    MICHAEL A. TELESCA
  United States District Judge

Dated:    Rochester, New York
          August 9, 2011.